COPY

ORIGINAL FILED

08 MAY -5 PM 12:54

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT CALIFORNIA

1 FRANK N. DARRAS #128904
2 LISSA A. MARTINEZ #206994
SHERNOFF BIDART DARRAS ECHEVERRIA, LLP
3 3257 East Guasti Road, Suite 300
4 Ontario, CA 91761
Telephone: (909) 390-3770
5 Facsimile: (909) 974-2121
6 Email: fdarras@sbd-law.com; lmartinez@sbd-law.com
7 Attorneys for Plaintiff: ELIZABETH MAIDA

E-filing

8 UNITED STATES DISTRICT COURT

9 NORTHERN DISTRICT OF CALIFORNIA

SC

10

11 ELIZABETH MAIDA,                          Case No.:    CV-08    2309

12          Plaintiff,                       COMPLAINT FOR BENEFITS
13                                           UNDER A GROUP DISABILITY
                                             EMPLOYEE BENEFIT PLAN
14     vs.

15 LIFE INSURANCE COMPANY OF
16 NORTH AMERICA; GRANITE
   BROADCASTING CORP LTD
17 PLAN;

18
          Defendants.
19

20

21      Plaintiff alleges as follows:

22      1.      This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331,

23 1337 and 29 U.S.C.§ 1132(a), (e), (f) and (g), of the Employee Retirement Income

24 Security Act of 1974, 29 U.S.C. § 1101, *et seq.* (hereafter "ERISA") as it involves

25 a claim by Plaintiff for Disability benefits under an employee benefit plan

26 regulated and governed under ERISA. Jurisdiction is predicated under these code

27 sections as well as 28 U.S.C. § 1331 as this action involves a federal question.

28      2.      The events or omissions giving rise to Plaintiff's claim occurred in this

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1    judicial district, thus venue is proper here pursuant to 28 U.S.C. § 1391(b)(2), and

2    the ends of justice so require.

3         3.    The ERISA statute at 29 U.S.C. § 1133, in accordance with

4    Regulations of the Secretary of Labor, provides a mechanism for internal appeal of

5    benefit denials.  Those avenues of appeal have been exhausted.

6         4.    Plaintiff is informed and believes and thereon alleges that Defendant,

7    GRANITE BROADCASTING CORP LTD PLAN, is an employee welfare benefit

8    plan established and maintained by Granite Broadcasting Corp. (which, Plaintiff

9    alleges, does business in the State of California, where MS. MAIDA was employed

10   just prior to her disability), to provide its employees, including MS. MAIDA, with

11   income protection in the event of a disability, and, is the Plan Administrator.

12        5.    Plaintiff alleges upon information and belief that Defendant, LIFE

13   INSURANCE COMPANY OF NORTH AMERICA ("LINA"), is, and at all

14   relevant times was, a corporation duly organized and existing under and by virtue

15   of the laws of the State of Pennsylvania; authorized to transact and transacting the

16   business of insurance in this state; and, the insurer and Claims Administrator for

17   the Plan.

18        6.    At all relevant times Plaintiff was, a resident and citizen of the State

19   of California, an employee of Granite Broadcasting Corp., its affiliates and/or

20   subsidiaries, and a participant in the Plan.

21        7.    Based upon information and belief, Plaintiff alleges that Defendant

22   LINA[1] issued Group Long Term Disability Policy number FLK-8059 to Granite

23   Broadcasting Corp. to insure its Plan, and the eligible participants and beneficiaries

24   of the Plan; and that the Policy promised to pay MS. MAIDA monthly benefits for

25   _____

26   [1] Although correspondence to MS. MAIDA during the administration of this claim has "CIGNA" on the letterhead,
     LINA was the underwriting and issuing company. Additionally, according to correspondence to MS. MAIDA on the
27   claim: "'CIGNA' and 'CIGNA Group Insurance' are registered service marks and refer to various operating
     subsidiaries of CIGNA Corporation. Products and services are provided by these subsidiaries and not by CIGNA
28   Corporation. These subsidiaries include Life Insurance Company of North America…" Therefore, both CIGNA and
     Life Insurance Company of North America will be referred to as "LINA" herein.

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

a specified period of time should she become disabled. Therefore, LINA suffers from a structural conflict as it both funds the plan and decides whether the claimants will receive benefits under the Plan[2].

8.    According to the terms of the Plan, LINA promised to pay benefits as follows:

| Term | Provision |
|---|---|
| Benefit Waiting Period | **CORE PLAN**: The Benefit Waiting Period for an Employee will be 180 days of continuous Disability. A period of Disability will be considered continuous even if the Disabled Employee returns to full time work in his regular job for up to a total of 30 days during the Benefit Waiting Period. The Benefit Waiting Period will be extended by the number of days the Employee temporarily returned to work.<br><br>**BUY-UP OPTION**: The Benefit Waiting Period for an Employee will be 90 days of continuous Disability. A period of Disability will be considered continuous even if the Disabled Employee returns to full time work in his regular job for up to a total of 15 days during the Benefit Waiting Period. The Benefit Waiting Period will be extended by the number of days the Employee temporarily returned to work. |
| Monthly Benefit | **CORE PLAN**: The Monthly Benefit for an Employee for any month is: |

[2] According to the recent case of *Saffon v. **Wells Fargo & Co**. Long Term Disability Plan* (F.3d, 2008 WL 80704 (9th Cir. (Cal.) Jan. 9, 2008): "In *Bruch*, the Supreme Court instructed us to 'weigh[]' a fiduciary's 'conflict of interest' as 'a facto[r] in determining whether there is an abuse of discretion.'...MetLife labors under such a conflict of interest: It both decides who gets benefits and pays for them, so it has a direct financial incentive to deny claims...The danger pervades the ERISA-plan world that a self-interested plan decision maker will take advantage...to line its own pockets by denying meritorious claim."

COMPLAINT

| Term | Provision |
|---|---|
|  | 1. The lesser of: |
|  |     a. 60% of the Employee's Basic Monthly Earnings rounded to the nearest dollar; or |
|  |     b. $6,000; and |
|  | 2. minus Other Benefits for that month. |
|  | BUY-UP OPTION: The Monthly Benefit for an Employee for any month is: |
|  | 1. The lesser of: |
|  |     a. 70% of the Employee's Basic Monthly Earnings rounded to the nearest dollar; or |
|  |     b. $6,000; and |
|  | 2. minus Other Benefits for that month. |
|  | The Monthly Benefit will not be less than $100 or 10% of the Monthly Benefit before reductions due to "Other Benefits" whichever is greater, regardless of any reductions shown in this Schedule. |
| **Duration of Benefits** | The Insurance Company will stop paying Monthly Benefits on the earlier of the following dates:<br>(1) the date the Employee ceases to be Disabled;<br>(2) the Employee's 65th birthday if he becomes Disabled before his 60th birthday;<br>(3) the end of 5 years from the date the Employee becomes Disabled if he becomes disabled on or after his 60th birthday. |
| **Disability** | An Employee will be considered Disabled if because of Injury or Sickness: |

| Term | Provision |
|---|---|
| | 1. he is unable to perform all the material duties of his regular occupation; and after Monthly Benefits have been payable for 24 months, he is unable to perform all the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience. |
| Residual Disability | An Employee will be considered Residually Disabled if, while he is Disabled, he returns to any work for wage or profit. |

9.    Prior to her disability, MS. MAIDA was an Account Executive for one of Granite Broadcasting Corp.'s affiliates and/or subsidiary employers, KNTV, a Bay Area NBC television station. Her substantial and material duties included establishing relationships with, and selling local spot time to, ad agencies and direct accounts through face to face presentations.

10.    Unfortunately, a series of medical events, beginning in 1999 led to her inability to perform the substantial and material duties of her own, or any, occupation and her ongoing disability under the terms of the Plan.

11.    On or about May 6, 1999, it was reported by a physician at UCSF Stanford Health Care:

- "…Ms. Maida has had bilateral Silicone implants that have now ruptured causing severe scar deformity."
- "Due to her reaction to implants with severe scarring as well as the possibility of leakage, she is not a candidate for further implant reconstruction."
- "Removal of the implants will leave her with her severe deformities and painful scar deformities from the ruptured implants."
- "At this point, the best and only reconstruction is to perform

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1   bilateral TRAM flap procedure[3] to remove the scar tissue and

2   replace it with healthy vascularized tissue."

3   12.   Unfortunately, the TRAM flap procedure left MS. MAIDA with a thin

4   abdominal wall, which was very susceptible to hernias.

5   13.   On or about October 23, 2001, Bruce L. Allen, M.D., advised the

6   following:

7   • "Elizabeth Maida was seen with regard to **recurrent ventral**

8   **hernias**[4]."

9   • "...she has had five separate procedures, which have involved the

10   use of mesh."

11   • "She is presently aware of a new recurrence in the right lower

12   quadrant."

13   • "She has also been advised that because of her multiple previous

14   procedures, she would be **at risk for other hernias in the future.**"

15   (Emphasis added.)

16   14.   Due to persistent abdominal pain and recurrent hernia surgeries[5], MS.

17   MAIDA became disabled under the terms of the Plan on or about November 7,

18   2001, and submitted a claim to LINA for payment of Long Term Disability

19   benefits.

20   15.   On or about July 2, 2002, LINA advised MS. MAIDA that it had

21

22   [3] TRAM stands for the transverse rectus abdominis muscle, which is located in the lower abdomen, between the
23   waist and the pubic bone. Unlike most other methods of breast reconstruction, the TRAM flap is completely natural,
    because it uses the body's own tissues to reconstruct your breast. However, the TRAM Flap operation is a major
24   surgery not to be taken lightly by either the physician or the patient.

25   [4] Ventral, or incisional hernias, are caused by thinning or stretching of scar tissue that forms after surgery. This
    weakened scar tissue then creates a weakness in the abdominal wall. Excessive weight gain, physical activity that
    places pressure on the abdomen, pregnancy, straining during bowel movements because of constipation, severe
26   vomiting, or chronic and intense coughing causes the scar tissue to thin or stretch. Because the abdominal wall is
    weak, the hernia occurs during abdominal strain.

27   [5] As explained by MS. MAIDA in a telephone conversation with LINA on or about October 15, 2002:
28   "...hernias...keep recurring because her stomach lining is very thin, as she no longer has stomach muscles. They
    were used to rebuild her chest area after required mastectomy from silicone implant leak."

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1  approved her claim in a letter which stated:

2    • "…your claim for Long Term Disability…benefits have been
3      approved."

4    • "Your first check will be sent separately…representing benefits
5      due for the period of May 6, 2002 through July 5, 2002."

6    16.    Further substantiating her disability, on or about December 24, 2003,

7  a Social Security Administrative Law Judge, after a hearing and submission of

8  documentation certifying MS. MAIDA's disability by LINA's own agent,

9  Advantage 2000, found that MS. MAIDA had been disabled since or about

10  November 7, 2001[6]. According to the Social Security Administration's Decision:

11    • "…a hearing was held on December 22, 2003 in San Jose,
12      California."

13    • "After a thorough evaluation of the entire record, the
14      Administrative Law Judge concludes that the claimant has been
15      disabled since November 7, 2001."

16    • "The claimant has not engaged in any substantial gainful activity
17      since the disability onset date."

18    • "The claimant has the **following impairments** which **are**
19      **considered** to be 'severe'…**multiple hernias** and **multiple**
20      **surgeries** following mastectomy after failed breast augmentation."
21      (Emphasis added.)

22    17.    LINA continued to pay benefits through the "Own Occupation"

23  disability definition period, and, on or about April 7, 2004, advised MS. MAIDA

24

25

26  [6] According to the Social Security definition of disability, which is more stringent than the subject Plan's Disability
     definition: "A person is disabled, and thereby eligible for Social Security disability insurance benefits and
27  Supplemental Security Income (SSI), "only if his physical or mental impairment or impairments are of such severity
     that *he is not only unable to do his previous work but cannot,* considering his age, education, and work experience,
28  *engage in any other kind of substantial gainful work which exists in the national economy.*" 42 U.S.C.
     §§423(d)(2)(A), 1382c(a)(3)(B) (emphasis added).

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1    that her long term disability had also been approved during the "Any Occupation"

2    disability definition period.  According to LINA's letter:

3        • "We have completed our review to determine if you are currently

4            Totally Disabled from performing any occupation for which you

5            are qualified at this time, based on your education, training and

6            experience."

7        • "Based on our evaluation, continued benefits have been

8            approved…"

9        18.    On or about April 6, 2006, Dr. Hilliard, a board certified family

10    physician, certified MS. MAIDA's continuing disability when she stated that her

11    physical impairment was a Class 5 (Severe limitations of functional capacity;

12    incapable of minimal (sedentary) activity).

13        19.    On or about September 6, 2006, Tue Dinh, M.D., a board certified

14    plastic surgeon, was asked to examine MS. MAIDA and subsequently reported:

15        • "Mrs. Maida has had previous multiple surgeries on the abdomen."

16        • "They started with removal of bilateral silicone ruptured breast

17            implant and subsequent bilateral rotational TRAM flap in 1999…"

18        • "She had mesh placed in the abdomen for reconstruction."

19        • "Subsequently, she has had multiple surgeries (11…) to treat over

20            20 recurrent hernias."

21        • "She still has at least three recurrent hernias, one on the right lower

22            abdomen, one on the left upper abdomen and on the left lateral

23            abdominal area."

24        • "She is in constant pain."

25        • **PAST MEDICAL HISTORY**: "Significant for autoimmune

26            connective tissue disease…also has liver function abnormality."

27        • **IMPRESSION**:

28            ▪ "My assessment…is that she has recurrent abdominal hernia

- 8 -

due to the failure of the mesh."

- "…in order to put a newer mesh in…We will need to be careful because she has had previous surgery, multiple times…"
- "I will talk to Dr. Baker and…have asked…to obtain the operative report from the initial surgery…and the last three operative reports on her abdomen, so I can further understand what is available and what is left in her abdominal wall."

20.    On or about December 1, 2006, Harriet Hilliard, M.D. wrote the following to LINA further substantiating MS. MAIDA's disability:

- "Chronic abd wall pain secondary to multiple hernia repair procedures which have failed."
- "…the patient's complaints of chronic pain can be substantiated by her recurring hernias."
- "Disability form was completed…due to patient's active and past chronic history of abdominal pain and failed hernia repairs."
- **MEDICATIONS**: Morphine Sulfate[7]; Lorazepam[8]; Ambien[9].

21.    On or about December 5, 2006, MS. MAIDA was once again admitted to a hospital. According to the Hospital's records:

- "…54 year old…with past history of breast implants status post bilateral mastectomy…"
- "…breast implants…ruptured and destroyed breast tissue."
- "…has chronic recurrent abdominal and umbilical hernias, has had over 12 surgeries to repair those."

---

[7] Side effects of this narcotic medication include sedation; respiratory depression; dizziness; drowsiness; upset stomach; vomiting; constipation; stomach pain and difficulty urinating.

[8] This medication, also known as Ativan, has the following side effects: depression; loss of orientation; headache; sleep disturbance; sedation; dizziness; weakness and unsteadiness.

[9] Side effects of this medication include: daytime drowsiness; dizziness; lightheadedness; diarrhea; and, constipation.

COMPLAINT

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1   • "...2 days ago...she develop[ed] some crampy abdominal pain and
2       notice some blood in her stool."
3   • **MEDICATIONS**: Include morphine. She is part of a pain
4       management clinic for recurrent hernias.
5   • **IMPRESSION**: Suspect diverticulitis.

6   22.   On or about December 7, 2006, MS. MAIDA underwent 2 more

7   procedures: an esophagogastroduodenoscopy[10], which revealed a hiatal hernia[11]

8   and gastritis (later identified as "marked chronic gastritis[12]" in a Surgical

9   Pathology Report); and a colonoscopy which revealed colitis[13], sigmoid

10  diverticulosis[14] and internal/external hemorrhoids.

11  23.   However, after having paid disability benefits for some four and a half

12  years, and without having conducted an independent medical examination, on or

13  about December 20, 2006, LINA unreasonably, arbitrarily and capriciously denied

14  further disability benefits to MS. MAIDA.

15  24.   Additionally, in denying her benefits, LINA unreasonably relied upon

16  in-house financially biased physicians who never examined MS. MAIDA, and

17

18  [10] Esophagogastroduodenoscopy (EGD) is an examination of the lining of the esophagus, stomach, and upper
19  duodenum with a small camera (flexible endoscope) which is inserted down the throat.

20  [11] A hernia occurs when one part of the body protrudes through a gap or opening into another part. A hiatal hernia
     forms at the opening in your diaphragm where your food pipe (esophagus) joins your stomach. Part of the stomach
21   pushes through this opening causing a hiatal hernia.

22  [12] Chronic gastritis is an inflammation of the lining of the stomach that occurs gradually and persists for a prolonged
     time. It may be caused by prolonged irritation from the use of nonsteroidal anti-inflammatory drugs (NSAIDs),
23   infection with the bacteria Helicobacter pylori, pernicious anemia (an autoimmune disorder), degeneration of the
     lining of the stomach from age, or chronic bile reflux. Common to all people with gastritis is pain or discomfort in
24   the upper part of the belly (abdomen), sometimes called dyspepsia.

25  [13] Colitis (also called ulcerative colitis) is an acute or chronic inflammation of the membrane lining the colon—the
     large intestine or bowel. Colitis causes inflammation and sores, called ulcers, in the top layers of the lining of the
26   large intestine. The inflammation makes the colon empty frequently, causing diarrhea. Ulcers form in places where
     the inflammation has killed colon lining cells. The ulcers bleed and produce pus and mucus. Symptoms may include
     abdominal pain, diarrhea, rectal bleeding, painful spasms (tenesmus), lack of appetite, fever, and fatigue.

27  [14] A diverticulum is a small circumscribed evagination of the intestinal wall in the small or large bowel. Most
     diverticula are found in the sigmoid, a segment of the large bowel located in the lower left abdomen. The presence
28   of several diverticula is called **diverticulosis**. Symptoms include pain in the lower abdomen; fever; signs of
     inflammation in the blood; and irregular bowel movements.

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

who, Plaintiff alleges upon information and belief, lacked the appropriate training to review MS. MAIDA's complex medical claim.

25.     On or about January 5, 2007, Dr. Stephen M. Thomas reported the following:

- "The patient has recently been hospitalized...for abdominal pain and GI bleeding."
- "She was found to have **severe acute descending colitis**."
- "Ongoing problems include **chronic lower abdominal pain secondary to recurrent, poorly operable ventral hernias**..."
- "I have called and discussed this case with her PCP at the time of her development of disability – Dr. Lorraine Page...[15]"
- "This 54 year old female has **progressive abdominal wall weakening** which has been documented many times by various surgeons."
- "She has **failed multiple levels of interventions** which have **left her with more pain and decreased function**."
- "In reviewing her disability status, **there certainly is no improvement from 2003 when she was first certified**."
- "I see no medical reason why she would have any easier time working today than she had at that time." (Emphasis added.)

26.     Shortly thereafter, MS. MAIDA wrote to LINA and stated:

- "Dr. Thomas has certified the problems I have – I cannot sit up but a few hours a day without severe discomfort and pain."
- "I have trouble standing up straight."
- "I have pain with walking, standing, climbing stairs and lifting or

---

[15] According to Dr. Thomas' notes regarding that conversation: "In his opinion, because the patient is suffering from similar complaint and still on medication with pain management as the only available treatment for her hernias as

COMPLAINT

1    carrying."

2    • "Also, my previous Dr.'s have said they cannot help me because

3    too many surgeries have been done and future surgeries will not

4    help...my problems have not changed since 2003."

5    • "I am also on very strong long term pain medication..."

6    27.    On or about April 25, 2007, MS. MAIDA underwent a Functional

7  Capacity Evaluation which also substantiated her disability as follows:

8    • "She has now had a total of 11 surgeries for the hernias alone and

9    has been **ruled out for any more surgeries because of the**

10    **extensive scar tissue.**"

11    • "She currently has **existing hernias** that are being **treated with**

12    **morphine** pain medication."

13    • "She has also **developed colitis** as a result of her heavy

14    medication."

15    • "Prior to her medical problems she was working for NBC

16    television in California as a television commercial salesperson."

17    • "She is now referred for a Functional Capacity Evaluation to help

18    determine her abilities."

19    • **ASSESSMENT OF WEAKNESSES**: Poor postural tolerance of

20    any kind secondary to existing hernia; decreased ability to lift and

21    carry; extremely guarded posture with bend at the waist secondary

22    to hernias; decreased lower extremity strength on manual muscle

23    testing; decreased ability to perform activities of daily living.

24    • **RECOMMENDATIONS:**

25    ▪ "She appears **limited in all activities secondary to the pain**

26    **from her hernia and subsequent surgeries.**"

27

28

diagnosed by multiple specialists, the patient's disability status is unchanged. There is no reason to expect that she will be any more successful in an attempt to be productive in employment now than there was in 2003."

- "She is not able to stand completely erect…due to her pain and has extremely guarded movement patterns."
- "It **does not appear likely that Ms. Maida will work again** unless her condition was to drastically improve."
- "This does not appear likely given her propensity for developing hernias and the fact that further surgery has been ruled out." (Emphasis added.)

28.    Despite the medical and other evidence substantiating her disability, including the Functional Capacity Evaluation and the use of morphine for pain control, LINA continued to rely upon in-house financially biased physicians who never examined MS. MAIDA to uphold the denial of the claim on or about March 7, 2007, and July 19, 2007.

29.    Additionally, in its denial of benefits, LINA unreasonably, arbitrarily and capriciously misinterpreted the terms of the Plan by equating an ability to perform the activities of daily living with an ability to work[16]. At the time that LINA made this allegation, it knew, or should have known, that the disability definitions in the Plan do not require an inability to perform the activities of daily living in order to qualify for disability benefits, only an inability to perform the material duties of any occupation. Such Plan misinterpretation heightens the level of skepticism with which a court views this already conflicted administrator's decision.

30.    To date, even though MS. MAIDA has been, and remains, disabled, LINA has not paid MS. MAIDA any disability benefits beyond November 5, 2006. The arbitrary and capricious nature of LINA's denial decision is evidenced by, but not limited to, the following:

- LINA engaged in procedural violations of its statutory obligations

---

[16] According to LINA's letter dated on or about July 19, 2007: "We note…that performing basic activities of daily living, such as dressing, showering, grooming, etc., easily reproduces the physical demands of sedentary type work."

SHERNOFF BIDART DARRAS ECHEVERRIA<sup>3</sup>
LAWYERS FOR INSURANCE POLICYHOLDERS

under ERISA, including, but not limited to, failing to identify the medical consultants who reviewed her file; failing to advise MS. MAIDA of what specific documentation it needed for her to perfect her claim; and, failing to provide a complete copy of all documents, records, and other information relevant to her claim despite a request by Plaintiff in violation of 29 C.F.R. Section 2560.530-1(h)(2)(iii);

- LINA ignored the obvious, combed the record and has taken selective evidence out of context as a pretext to deny Plaintiff's claim;

- LINA failed to obtain a copy of all the documentation substantiating disability that was submitted by its own agent, Advantage 2000, to the Social Security Administration;

- LINA did not give proper weight to the Social Security Administration's continued finding that MS. MAIDA was disabled from any occupation[17].

- LINA did not have MS. MAIDA independently examined to adequately refute the findings of her treating physicians; and,

- LINA ignored the opinions of MS. MAIDA's treating physicians. Deference should be given to the treating physician's opinions as there are no *specific*, *legitimate* reasons for rejecting the treating physician's opinions which are based on *substantial evidence* in the claim file. Further, LINA's **physicians'** opinions do not serve as *substantial evidence*, as they are not *supported by evidence* in the claim file nor are they *consistent with the overall evidence* in the

[17] A Plan administrator may not arbitrarily disregard a favorable ruling by the Social Security Administration as, at a minimum, it provides support for the conclusion that an administrative agency charged with examining MS. MAIDA's medical records found objective support for its favorable decision.

COMPLAINT

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1    claim file.

2    31.    For all the reasons set forth above, the decision to deny disability

3    insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational,

4    sorely contrary to the evidence, contrary to the terms of the Plan and contrary to

5    law. Clearly, LINA abused its discretion in deciding to deny this claim as the

6    evidence shows its denial decision was arbitrary and capricious. Further, LINA's

7    denial decision and actions heighten the level of skepticism with which a court

8    views a conflicted administrator's decision under *Abatie v. Alta Health & Life*

9    *Insurance Co.*, 458 F.3d 955 (9th Cir. 2006).

10    32.    As a direct and proximate result of the LINA's failure to provide MS.

11    MAIDA with disability benefits, MS. MAIDA has been deprived of said benefits

12    from on or about November 5, 2006, to the present date.

13    33.    As a further direct and proximate result of the denial of benefits, MS.

14    MAIDA has been required to incur attorney fees to pursue this action, and is

15    entitled to have such fees paid by defendants pursuant to 29 U.S.C. § 1132(g) (1),

16    ERISA § 502(g) (1).

17    34.    A controversy now exists between the parties as to whether MS.

18    MAIDA is disabled as defined in the Plan.  Plaintiff seeks the declaration of this

19    Court that she meets the Plan definition of disability and thus she is entitled to

20    benefits from the Plan.  In the alternative, Plaintiff seeks a remand to the Plan

21    Administrator for a determination of Plaintiff's claim consistent with the terms of

22    the Plan.

23    WHEREFORE, Plaintiff prays for relief against Defendants as follows:

24    1.    An award of benefits in the amount not paid MS. MAIDA from on or

25    about November 5, 2006, to the date of judgment herein, together with interest at

26    the legal rate on each monthly payment from the date it became due until the date

27    it is paid; or, in the alternative, a remand to the Plan Administrator for a

28    determination of Plaintiff's claim consistent with the terms of the Plan;

SHERNOFF BIDART
DARRAS ECHEVERRIA
LAWYERS FOR INSURANCE POLICYHOLDERS

1        2.    An order determining MS. MAIDA is entitled to future disability

2    payments so long as she remains disabled as defined in the Plan;

3        3.    An order requiring LINA to pay $110 a day, from the date first

4    requested, for each day in which LINA failed or refused to comply with Plaintiff's

5    requests for information which LINA was required, by statute/regulation, to

6    furnish pursuant to ERISA section 502(c) [29 USC sec. 1132(c)].

7        4.    For reasonable attorney fees incurred in this action; and

8        5.    For such other and further relief as the Court deems just and proper.

9

10    DATED:  April 28, 2008        SHERNOFF BIDART DARRAS

11                          ECHEVERRIA, LLP

12

13

14                          FRANK N. DARRAS

15                          Attorney for Plaintiff: Elizabeth Maida

16

17

18

19

20

21

22

23

24

25

26

27

28

- 16 -

LIFE INSURANCE COMPANY OF NORTH AMERICA
(herein called the Company)

Amendment to be attached to and made a part of the Group Policy
A Contract between the Company and

GRANITE BROADCASTING CORPORATION

(herein called the Policyholder)

Group Policy No.: FLK-8059                    Effective Date:  July 1, 1995

The Amendment will be in effect only for eligible Employees in Active Service on the
Effective Date shown above.  If an Employee is not in Active Service on the date he
would otherwise become eligible, he will become eligible on the date he returns to
Active Service provided any required Waiting Period has been satisfied.

The Company and the Policyholder hereby agree that the Policy is amended as follows:

As of the Effective Date shown above, Classes of Eligible Employees of the Affiliates or
Subsidiaries named below are eligible to be covered under the Group Policy.

AFFILIATES OR SUBSIDIARIES

WWMT-TV

PITTSBURGH
OCT 0 5 1995
Group Life & Disability
Benefits Office

Except for the above, this amendment does not change the Policy in any way.

FOR THE COMPANY

By:

SPECIMEN

Date:

EXHIBIT A                                            000017

LIFE INSURANCE COMPANY OF NORTH AMERICA
1601 CHESTNUT STREET, PHILADELPHIA, PA   19192
A STOCK INSURANCE COMPANY

GROUP
LONG TERM DISABILITY
INCOME POLICY

(Non-Participating)

Group Policy No. FLK-8059                    Policy Delivered In: IL

Policy Effective Date: January 1, 1995       Policy Anniversary Date: January 1

Premium Due Dates: February 1 and the first day of each calendar month thereafter subject to Annual adjustment.

This is a contract between us, the Life Insurance Company of North America, and you,

GRANITE BROADCASTING CORPORATION

(the Policyholder).

In return for your application, and for the payment of premiums as set forth in this policy, we agree to pay the benefits described in this policy. These benefits are subject to all of the terms of this policy, including any riders, endorsements, and amendments.

This policy goes into effect on the Policy Effective Date, 12:01 a.m. at your address. The policy will stay in force as long as the premium is paid, until terminated by you or us.

This contract shall be governed by the laws of the state in which it is delivered.

IN WITNESS WHEREOF, we have signed this policy at Philadelphia, PA.

*Illana G. Hessing*

*John K. Leonard*
JOHN K. LEONARD, President

PITTSBURGH
MAR 20 1995
Group Life and
Benefits Office

SPECIMEN

LM-6N05          Group Long Term Disability Income Policy



LONG TERM DISABILITY INCOME POL  Y

## CONTENTS

I. BENEFITS                                                    PAGE

   Benefit Waiting Period and Benefit Amount                   10
   Insuring Provisions                                         15
   Payment of Benefits                                         25
   Schedule                                                    10


II. PREMIUMS

   Calculation of Premiums and Rate                            23
   Changes in Premium Rates                                    23
   Due Dates                                                   21
   Grace Period                                                24
   Payment of Premiums                                         21
   Waiver of Premium                                            8


III. OTHER PROVISIONS

   Cancellation of Policy                                      24
   Certificate                                                 27
   Claims, Forms, Notice of Claim                              26
   Definitions                                                  3
   Effective Date of Insurance                                  7
   Eligibility of Insurance                                     6
   Extension of Benefits after Cancellation                     8
   Termination of Insurance                                     8

This policy includes the following attached forms on date of issue:

EXHIBIT A                                    000019

LONG TERM DISABILITY INCOME POLICY

## DEFINITIONS

**EMPLOYER.** The term Employer means the Policyholder and all Affiliated Employers shown in the "Affiliated or Subsidiary Employers" rider.

**EMPLOYEE.** The term Employee means a full-time Employee of the Employer, but does not include Employees who are part-time or temporary or who normally work less than 30 hours a week for the employer.

**ACTIVE SERVICE.** An Employee will be considered in Active Service with the Employer on a day which is one of the Employer's scheduled work days if he is performing in the usual way all of the regular duties of his work for the Employer on a full time basis on that day, either at one of the Employer's usual places of business or at some location to which the Employer's business requires him to travel. An Employee will be deemed in Active Service on a day which is not one of the Employer's scheduled work days only if he was in Active Service on the preceding scheduled work day.

**INJURY.** The term Injury means an accidental bodily injury.

**SICKNESS.** The term Sickness means a physical or mental illness. It also includes pregnancy.

**RETIREMENT PLAN.** The term Retirement Plan means any defined benefit plan or defined contribution plan (including a profit sharing plan) sponsored by the Employer. It does not include: (1) an individual deferred compensation agreement; (2) a profit sharing or any other retirement or savings plan that is maintained in addition to a defined benefit or other defined contribution pension plan; or (3) any Employee savings plan including a thrift, stock option or stock bonus plan, individual retirement account or 401(k) plan.



EXHIBIT A                                    000020

LONG TERM DISABILITY INCOME POLI...

---

### DEFINITIONS (Continued)

**BASIC EARNINGS.** The term Basic Earnings means the Employee's rate of pay reported by the Employer. It does not include overtime, bonus, additional compensation or pay for more than 40 hours a week.

For an Employee who is paid wholly or in part by commissions, the term Basic Earnings will also include commissions based on an average of the commissions paid by the Employer for the 12 months immediately preceding the onset of Disability. If such Employee was not in the employ of the Employer during the entire preceding 12 month period, his commissions will be based on an average of the total number of months he was so employed.

Basic Earnings are determined initially on the date the Employee becomes insured. A change in the amount of Basic Earnings will be considered effective on the date of the change. If the Employee is not in Active Service on that day, no increase in Basic Earnings will be considered effective until he returns to Active Service for one full day. In no event will an increase in an Employee's Basic Earnings be considered effective if it occurs:

    (1)   between separate periods of Disability which are considered one period under the Successive Periods of Disability provision; or

    (2)   during a Benefit Waiting Period.

**INDEXED BASIC EARNINGS.** An Employee's Indexed Basic Earnings is an amount determined as follows:

For the first year the Employee is disabled, his Indexed Basic Earnings will be equal to his Basic Earnings.

After the Employee has been disabled for 1 year, his Basic Earnings will be increased on each annual anniversary of the date he became disabled. The amount of each increase will equal A or B, whichever is less where:

    A =   10% of the Employee's Indexed Basic Earnings during the preceding year of Disability.

    B =   The rate of increase in the Consumer Price Index (CPI-W) during the preceding calendar year.

The Employee's Basic Earnings will not be decreased by a drop in the Consumer Price Index (CPI-W).

CPI-W means the Consumer Price Index for Urban Wage Earners and Clerical Workers published by the US Department of Labor. If the index is discontinued or changed, another nationally published index that is comparable to the CPI-W will be used.

---

LM-6N09                       Definitions (Continued)



EXHIBIT A

000021

LONG TERM DISABILITY INCOME POLIC.

---

### DEFINITIONS (Continued)

DISABILITY.  An Employee will be considered Disabled if because of Injury or Sickness:
1. he is unable to perform all the material duties of his regular occupation; and after Monthly Benefits have been payable for 24 months, he is unable to perform all the material duties of any occupation for which he is or may reasonably become qualified based on his education, training or experience.

RESIDUAL DISABILITY.  An Employee will be considered Residually Disabled if, while he is Disabled, he returns to any work for wage or profit.

---

LM-6N09                          Definitions (Continued)



000022

LONG TERM DISABILITY INCOME POLICY

---

### ELIGIBILITY FOR EMPLOYEE INSURANCE

Each Employee in one of the Classes of Eligible Employees shown below will become eligible for Employee Insurance on the day he completes the Waiting Period, if any. An Employee who was previously insured and whose insurance ceased must satisfy the New Employee Group Waiting Period to become insured again. If the insurance on an Employee ceased because he was no longer employed in a Class of Eligible Employees, he is not required to satisfy any Waiting Period if he again becomes a member of a Class of Eligible Employees within one year after his insurance ceased.

**INITIAL EMPLOYEE GROUP.** The Initial Employee Group is made up of Employees:

    (1)  in the employ of an Employer on the Effective Date of the policy; or

    (2)  in the employ of an Employer on the date that Employer becomes an Affiliated Employer.

**NEW EMPLOYEE GROUP.** The New Employee Group is made up of Employees whose employment with an Employer starts after the Effective Date of the policy.

**WAITING PERIOD.**
    Initial Employee Group:
        None

    New Employee Group:
        On the first day of the month following thirty continuous days of Active Service with the Employer.

**CLASSES OF ELIGIBLE EMPLOYEES.**

Class 1        All active full-time employees of the Policyholder working a minimum of 30 hours per week.

---

 EXHIBIT A

000023

LONG TERM DISABILITY INCOME POLI

---

### EFFECTIVE DATE OF EMPLOYEE INSURANCE

Each Employee will become insured for Employee Insurance under either (1) or (2) as shown below:

(1)  An Employee who is not required to contribute toward the cost of his Group Disability Core Plan will become insured for Employee Insurance on the date he becomes eligible for it.

(2)  An Employee who is required to contribute toward the cost of his Group Disability Buy-Up Plan may elect to be insured for Employee Insurance only by signing a payroll deduction form approved by the Policyholder and the Insurance Company. The Effective Date of his insurance depends on the date on which he elects the insurance.

 (a)  If he elects Employee Insurance on or before the date he becomes eligible, his insurance will become effective on the date he becomes eligible.

 (b)  If he elects Employee Insurance within 31 days after he becomes eligible, his insurance will become effective on the date of election.

 (c)  If he elects Employee Insurance more than 31 days after he becomes eligible, his insurance will become effective on the date the Insurance Company agrees in writing to insure him.

 (d)  If his Employee Insurance ceased because he cancelled his payroll deduction, and he again elects to be insured, his insurance will become effective on the date the Insurance Company agrees in writing to insure him.

 Under the circumstances described in items c and d, the Insurance Company may require the Employee to submit evidence of good health acceptable to the Insurance Company at his own expense before it agrees to insure him.

If an Employee is not in Active Service on the date his insurance would otherwise become effective, it will become effective on the date he returns to Active Service.

---



EXHIBIT A                    000024

LONG TERM DISABILITY INCOME POLICY

## TERMINATION OF INSURANCE

The insurance on an Employee will cease on the earliest date below:

(1) the date the Employee ceases to be in a Class of Eligible Employees or ceases to qualify as an Employee;

(2) the last day for which the Employee has made a required premium contribution for the insurance;

(3) the date the policy is cancelled;

(4) the date the Employee's Active Service ends, except as set forth below.

    (a) If the Employee's Active Service ends due to Disability for which Monthly Benefits are or may become payable, the insurance for that Disabled employee will continue during the Benefit Waiting Period and thereafter, but only for as long as Monthly Benefits are payable for Disability or Residual Disability.

    (b) Or, if the Employee's Active Service ends due to an unpaid leave of absence approved by the Employer, insurance for that Employee will continue while the Employee is on leave for a period not to exceed 4 weeks.

(5) If the Employer insures his Employee as a member of a trade association or an insurance trust fund, on the date that the Employer no longer participates.

## WAIVER OF PREMIUM

Premium for an Employee will be waived while Monthly Benefits for Disability or Residual Disability are payable to him.

## EXTENSION OF BENEFITS AFTER CANCELLATION

Payment of Monthly Benefits will not be affected by cancellation of this policy as long as the Disability begins while this policy is in force.

---

EXHIBIT A

000025

LONG TERM DISABILITY INCOME POLIC.

---

## CONVERSION PRIVILEGE

**HOW AND WHEN TO CONVERT.** When an Employee's Long Term Disability Insurance under this policy ceases, he may be eligible to be insured under a group policy providing converted long term disability benefits (called Converted Insurance) only if he: (1) is Entitled to Convert; and (2) applies in writing and pays the first premium for Converted Insurance to the Insurance Company within either of the following periods of time after the date his insurance under this policy ceases:

(a) within 31 days, without evidence of good health; or

(b) after 31 days but not more than 62 days, with evidence of good health.

**ENTITLED TO CONVERT.** An Employee is Entitled to Convert Long Term Disability Insurance only if:

(1) he has been insured for at least 12 consecutive months under this policy or under this and a prior Long Term Disability group policy issued to the Policyholder; and

(2) his insurance under this policy ceased because he was no longer in Active Service because of resignation, involuntary termination, layoff or an uninsured leave of absence.

**NOT ENTITLED TO CONVERT.** An Employee is not Entitled to Convert if:

(1) he is no longer in a Class of Eligible Employees;

(2) he has attained age 70;

(3) he has retired;

(4) he is not in Active Service because of disability; or

(5) this policy is cancelled for any reason.

**CONVERTED INSURANCE.** Converted Insurance will be provided under the plan of benefits offered by the Insurance Company at the time the first premium is received.

A certificate under the group converted policy will be issued to the Employee describing his benefits. Converted Insurance will take effect on: (a) the day after the Employee's insurance under this policy ceases; or (b) in the case that an Employee is required to submit evidence of good health, the day the Insurance Company accepts the evidence. The premium on the day it takes effect will be based on: (a) class of risk; (b) age; and (c) benefits.

The Insurance Company or the Policyholder will give the Employee further details of the available Converted Insurance.

---

LM-27271                        Conversion Privilege

 EXHIBIT A

000026

LONG TERM DISABILITY INCOME POLI.

SCHEDULE

CORE PLAN:

BENEFIT WAITING PERIOD. The Benefit Waiting Period for an Employee will be 180 days of continuous Disability. A period of Disability will be considered continuous even if the Disabled Employee returns to full-time work in his regular job for up to a total of 30 days during the Benefit Waiting Period. The Benefit Waiting Period will be extended by the number of days the Employee temporarily returned to work.

MONTHLY BENEFIT. The Monthly Benefit for an Employee for any month is:
1.  The lesser of:
    a.  60% of the Employee's Basic Monthly Earnings rounded to the nearest dollar;
        or
    b.  $6,000; and
2.  minus Other Benefits for that month.

BUY-UP OPTION:

BENEFIT WAITING PERIOD. The Benefit Waiting Period for an Employee will be 90 days of continuous Disability. A period of Disability will be considered continuous even if the Disabled Employee returns to full-time work in his regular job for up to a total of 15 days during the Benefit Waiting Period. The Benefit Waiting Period will be extended by the number of days the Employee temporarily returned to work.

MONTHLY BENEFIT. The Monthly Benefit for an Employee for any month is:
1.  The lesser of:
    a.  70% of the Employee's Basic Monthly Earnings rounded to the nearest dollar;
        or
    b.  $6,000; and
2.  minus Other Benefits for that month.

The Monthly Benefit will not be less than $100. or 10% of the Monthly Benefit before reductions due to "Other Benefits" whichever is greater, regardless of any reductions shown in this Schedule. Monthly Benefits will be pro-rated if payable for any period less than a month.



EXHIBIT A

000027

LONG TERM DISABILITY INCOME POLI...

SCHEDULE (Continued)

**RESIDUAL DISABILITY BENEFIT.** The Monthly Benefit for any month during which the Employee is Residually Disabled will be:
1. the Monthly Benefit as figured above for the first 12 months Residual Disability Benefits are payable; and
2. the Monthly Benefit as figured above minus 50% of the Employee's monthly earnings received while he is Residually Disabled after the first 12 months Residual Disability Benefits are payable.

If, during any month the Employee returns to work the sum of his Residual Disability Benefit, his earnings, and any Other Benefits, exceed:
1. 100% of his Indexed Basic Monthly Earnings for the first 12 months benefits are payable for Residual Disability; or
2. 80% of his Indexed Basic Monthly Earnings after the first 12 months benefits are payable for Residual Disability;
his Residual Disability Benefit will be further reduced by such excess amount.

The Residual Disability Benefit will continue until the earlier of the following dates:
1. the date the Employee is no longer Disabled; or
2. the date Monthly Benefits are no longer payable.

The Insurance Company will, from time to time, review the Employee's status and may require an account of his earnings and proof of continued Disability.

The Monthly Benefit during a period of Residual Disability will not be less than $100. or 10% of the Monthly Benefit before reductions due to "Other Benefits" whichever is greater, regardless of any reductions shown in this Schedule. Residual Disability Benefits will be pro-rated if payable for any period less than a month.

---

LM-6N13                                 Residual Benefit



EXHIBIT A

000028

LONG TERM DISABILITY INCOME POLICY.

SCHEDULE (Continued)

OTHER BENEFITS. Other Benefits include:

(1)  any amounts which the Employee or his dependents receive on account of his disability under:

    (a)  any group or franchise insurance or similar plan for persons in a group;

    (b)  the Canada and Quebec Pension Plans;

    (c)  any local, provincial or federal government disability or retirement plan or law;

    (d)  any state disability or retirement benefits which the Employee receives (or is assumed to receive*) on his own behalf;

    (e)  any salary or wage continuance plan of the Employer;

    (f)  the Jones Act; or any workers' compensation, occupational disease or similar law including all permanent as well as temporary disability benefits;

    (g)  any work loss provision in the mandatory part of any "No-Fault" auto insurance policy;

(2)  any disability or Old Age benefits payable under the Federal Social Security Act, which the Employee receives (or is assumed to receive*) on his own behalf;

(3)  any disability or Old Age benefits payable under the Federal Social Security Act which the Employee receives (or is assumed to receive*) on behalf of his dependents; or which his dependents receive on account of the Employee's receipt (or assumed receipt*) of such benefits; and

(4)  any retirement benefits which an Employee receives under: (a) a Retirement Plan sponsored by the Employer; (b) the Canada and Quebec Pension Plans; (c) the Railroad Retirement Act or the Railroad Unemployment Insurance Act, to the extent these benefits are funded by the Employer.

*See the Assumed Receipt of Benefits provision.

OTHER INSURANCE. If there is other Group Disability insurance which:
    a)  applies to the same claim for Disability; and
    b)  contains the same or similar provision for reduction because of Other Benefits;

the policy shall be liable for its pro rata share of the total claim.

"Pro rata share" means the proportion of the total benefit that the amount payable under one policy, in the absence of such other insurance, bears to the total applicable benefits under all such policies.

---

LM-6N14                    Other Benefits


EXHIBIT A

000029

LONG TERM DISABILITY INCOME POLICY

---

SCHEDULE (Continued)

ASSUMED RECEIPT OF BENEFITS.

If an Employee is covered under the Federal Social Security Act, for any disability or Old Age benefit, Statutory Disability (if applicable), Worker's Compensation, or similar laws, he will be assumed to be receiving such benefits for himself (and for his dependents, if applicable). These assumed benefits will be the amount the Insurance Company estimates he (and his dependents, if applicable) is eligible to receive. This assumption will not be made if the Employee gives the Insurance Company proof that:

    (1)  he has applied for these benefits; and

    (2)  payments were denied.

However, if payments for disability were denied solely because the disability was not expected to last at least 12 consecutive months, the Employee will be assumed to be receiving such benefits after his disability has continued for 12 consecutive months. This assumption will not be made if he gives the Insurance Company proof that:

    (1)  he has re-applied for benefits; and

    (2)  payments were again denied.

The Insurance Company will not assume receipt of, nor reduce the Monthly Benefit by, any elective, actuarially reduced, early retirement benefits under such laws until the Employee actually receives such benefits.

INCREASES IN OTHER BENEFITS

The Insurance Company will not consider any cost of living increase in any Other Benefits which is effective after:

    (1)  the first payment of such Other Benefit becomes due; and

    (2)  Monthly Benefits become payable under the policy.

RECOVERY OF OVERPAYMENTS

If the Monthly Benefit for any month is overpaid, the Insurance Company has the right to recover the amount overpaid by either of the following methods:

    (1)  a deduction of the overpaid amount from any future payments by the Insurance Company; or

    (2)  a lump sum repayment by the Employee of the overpaid amount.

---



EXHIBIT A    000030

LONG TERM DISABILITY INCOME POLICY.

SCHEDULE (Continued)

LUMP SUM PAYMENTS.

Any Other Benefits paid in a lump sum (except as shown below) will be deemed to be paid in monthly amounts prorated over the time for which the sum was paid.  If no such time is stated, the lump sum will be prorated monthly over the expected life span of the Employee.  The Insurance Company will determine that expected life span.

Lump Sum Payments under:

    (1)  a Retirement Plan will be deemed to be paid in the monthly amount which:

        (a)  is provided by the standard annuity option under the Plan, as identified by the Policyholder; or

        (b)  is prorated under a standard annuity table over the expected life span of the Employee (if the Plan does not have a standard annuity option);

    (2)  the Jones Act or any workers' compensation, occupational disease or similar law (which includes benefits paid under a Compromise and Release) will be deemed to be paid monthly;

        (a)  at the rate stated in the award;

        (b)  at the rate paid prior to the lump sum (if no rate is stated in the award); or

        (c)  at the maximum rate set by the law (if no rate is stated and the Employee did not receive a periodic award).

EXHIBIT A

000031

LONG TERM DISABILITY INCOME POLICY

INSURING PROVISIONS

LONG TERM DISABILITY BENEFITS

COMMENCEMENT OF BENEFITS.

The Insurance Company will begin paying Monthly Benefits in amounts determined from the Schedule when it receives due proof that:

    (1)  the Employee became Disabled while insured for this Long Term Disability Insurance; and

    (2)  his Disability has continued for a period longer than the Benefit Waiting Period shown in the Schedule.

If an Employee is on an Employer approved leave of absence, Monthly Benefits will not be payable until the later of: a) the date the Benefit Waiting Period is satisfied; or b) the date the Employee was scheduled to return to Active Service.

DURATION OF BENEFITS.

The Insurance Company will stop paying Monthly Benefits on the earlier of the following dates:

    (1)  the date the Employee ceases to be Disabled;

    (2)  the Employee's 65th birthday if he becomes Disabled before his 60th birthday;

    (3)  the end of 5 years from the date the Employee becomes Disabled if he becomes disabled on or after his 60th birthday.



EXHIBIT A

000032

ONG TERM DISABILITY INCOME POL.

INSURING PROVISIONS

LONG TERM DISABILITY BENEFITS (Continued)

MENTAL ILLNESS, ALCOHOLISM AND DRUG ABUSE LIMITATION.

The Insurance Company will pay Monthly Benefits for no more than 24 months during an Employee's lifetime for Disability or Residual Disability caused by any one or more of the following conditions:

> Alcoholism
> Drug addiction or abuse
> Bipolar affective disorder (manic depressive syndrome)
> Schizophrenia
> Delusional (paranoid) disorders
> Psychotic disorders
> Depressive disorders
> Anxiety disorders
> Somatoform disorders (psychosomatic illness)
> Eating disorders
> Mental Illness

This limitation shall not apply to any period of time during which the Employee is confined for more than fourteen consecutive days in a hospital licensed to provide care and treatment for the condition causing the Disability.

LM-6N21                    Mental Illness, Alcoholism and Drug Abuse

Page 16

EXHIBIT A

000033

.ONG TERM DISABILITY INCOME POL₁

INSURING PROVISIONS

LONG TERM DISABILITY BENEFITS (Continued)

PRE-EXISTING CONDITION LIMITATION.

The Insurance Company will not pay Monthly Benefits for any period of Disability which results, directly, from an Injury or Sickness for which the Employee, during the 3 months prior to the most recent Effective Date of his insurance: (1) incurred expenses; (2) received medical treatment; (3) took prescribed drugs or medicines; or (4) consulted a physician. This limitation will not apply to a period of Disability which begins more than 12 months after the most recent Effective Date of the Employee's Insurance.

CONTINUITY OF COVERAGE AND PRE-EXISTING CONDITION LIMITATION.

The Pre-existing Condition Limitation will be waived, as described below, for an Employee who was insured on the day before the Effective Date of this policy under a group long term disability policy: (a) sponsored by the Employer; and (b) replaced by this policy; provided such Employee:

   (1)  is in Active Service on the Effective Date of this Policy; and

   (2)  has fulfilled the requirements of any Pre-existing Condition Limitation of the replaced policy.

However, if such Employee:

   (1)  is in Active Service on the Effective Date of this policy; and

   (2)  has not fulfilled the requirements of any Pre-existing Condition Limitation of the replaced policy because the time period required prior to start of Disability has not been satisfied;

any portion of time which may have been satisfied under such Pre-existing Condition Limitation will be applied toward the satisfaction of that time period requirement of the Pre-existing Condition Limitation of this policy.

If Monthly Benefits are determined to be payable, they will be paid according to the provisions of this policy.



000034

_ONG TERM DISABILITY INCOME POL, .

INSURING PROVISIONS

LONG TERM DISABILITY BENEFITS (Continued)

SUCCESSIVE PERIODS OF DISABILITY.

Separate periods of Disability resulting from the same or related causes will be considered one period of Disability unless separated by the Employee no longer being qualified to receive Monthly Benefits for at least 6 consecutive months.

Separate periods of Disability resulting from unrelated causes will be considered one period of Disability unless separated by a period of at least one full day, during which the Employee is no longer qualified to receive Monthly Benefits.

These provisions do not apply:

    (1)   to the Benefit Waiting Period; or

    (2)   when the Employee becomes eligible for benefits under any group long term disability policy.



EXHIBIT A

000035

INSURING PROVISIONS

LONG TERM DISABILITY BENEFITS (Continued)

FAMILY SURVIVOR BENEFITS.

The Insurance Company will pay Family Benefits as set forth below for up to 3 months if:

(1) the Employee becomes Disabled while insured for Family Benefits;

(2) the Disability has continued for at least 6 months beyond the Benefit Waiting Period; and.

(3) the Employee dies while Monthly Benefits are being paid for that Disability and the Insurance Company receives due proof of death.

PAYMENT OF FAMILY BENEFITS.

Family Benefits will be payable Monthly beginning one month after the Employee's death. Family Benefits will be paid to the Employee's lawful spouse if living. If the lawful spouse is not living when any Family Benefit is due, it will be paid in equal shares to each child of the Employee. No Family Benefits will be paid if there is no lawful spouse or child.

The term child means the Employee's unmarried child (including a stepchild living with the Employee at the time of death) who is less than 21 years old. Family Benefits may not be assigned. Payment to anyone as provided above will release the Insurance Company from all liability for Family Benefits to the extent of the payments made.

AMOUNT OF FAMILY BENEFITS.

The amount payable for Family Benefits will be equal to 100% of the sum of:

(1) the Monthly Benefit due for the last full month of Disability before the Employee's death; and

(2) any amount by which such Monthly Benefit was reduced because of wage or profit received for work performed.

EXHIBIT A

.JNG TERM DISABILITY INCOME POLI.

INSURING PROVISIONS

LONG TERM DISABILITY BENEFITS (Continued)

EXCLUSIONS.

No Monthly Benefits will be paid if the Employee's Disability or Residual Disability results, directly or indirectly, from:

    (1)  injuries intentionally self-inflicted while sane or insane; or

    (2)  any act or hazard of a declared or undeclared war.

No Monthly Benefits will be paid for a period of Disability or Residual Disability when the Employee is not under the care of a licensed physician.

---

LM-6N27                          Exclusions

Page 20



LONG TERM DISABILITY INCOME POLICY

PREMIUMS

**PREMIUM PAYMENT.** The first premium will be due on the Effective Date. After that, premium will be due monthly unless the Policyholder and the Insurance Company agree on some other method of premium payment. The Policyholder and the Insurance Company may agree to change the method of premium payment from time to time. Premiums are payable at the Home Office of the Insurance Company or to an authorized agent of the Insurance Company.

**PREMIUM DUE DATE.** After the Effective Date, the Premium Due Date will be the day of the month with the same number as the Anniversary Date or the last day of a month in which there is no day with the same number as the Anniversary Date. If the Policyholder and the Insurance Company agree that premiums will be paid on a quarterly, semi-annual or annual basis, the Premium Due Date will be at the appropriate regular interval, quarterly, semi-annually or annually.

**MONTHLY STATEMENT DATE.** If premiums are to be paid monthly, the Monthly Statement Date will be the same as the Premium Due Date. If premiums are to be paid on a quarterly, semi-annual or annual basis, the Monthly Statement Date will be the day in each month with the same number as the Premium Due Date.

**MONTHLY PREMIUM STATEMENT.** If premiums are due monthly, a Monthly Premium Statement will be prepared as of the Premium Due Date. This Monthly Premium Statement will show the premium due. If premiums are due quarterly, semi-annually or annually, a Monthly Premium Statement will be prepared as of the Monthly Statement Date for the time from the Monthly Statement Date to the next Premium Due Date. This Monthly Statement will reflect any pro rata premium charges and credits due to changes in the number of insured persons and changes in insurance amounts that took place in the preceding month.

**SIMPLIFIED ACCOUNTING.** To simplify the accounting process, premium adjustments will be made on the Monthly Statement Date that is the same as or next follows the date that (1), (2) or (3) below takes place.

    (1)  A person becomes insured.

    (2)  The amount of insurance on a person changes, but not due to revision of the Schedule.

    (3)  A person ceases to be insured.




LONG TERM DISABILITY INCOME POLICY

PREMIUMS   (Continued)

MONTHLY PREMIUM RATE

CORE PLAN:

The monthly premium for each employee will be determined at the rate of $.26 per
month for each $100 of Covered Payroll.

Covered Payroll for an Employee will mean his monthly rate of Basic Earnings for
the insurance month prior to the date such determination is made.  However, an
Employee's Covered Payroll will not include any part of his monthly Basic Earnings
which exceed $10,000.

BUY-UP OPTION:

The monthly premium for each employee will be based on the Employees Age and amount
of Covered Payroll.  The Monthly Rates per $100 of Covered Payroll are set forth in
the Table of Monthly Insurance Rates below and are in addition to the Monthly
Premium for the CORE Plan.  Each Employee's rate will be calculated on his age as
of the last plan anniversary.

### Table of Monthly Insurance Rates

| AGE | RATE |
|-----|------|
| Up to 25 | .07 |
| 25-29 | .11 |
| 30-34 | .16 |
| 35-39 | .20 |
| 40-44 | .31 |
| 45-49 | .41 |
| 50-54 | .59 |
| 55-59 | .74 |
| 60-64 | .74 |
| 65-69 | .66 |
| 70+ | .71 |

Covered Payroll for an Employee will mean his monthly rate of Basic Earnings for
the insurance month prior to the date such determination is made.  However, an
Employee's Covered Payroll will not include any part of his monthly Basic Earnings
which exceed $8,571.



EXHIBIT A

000039

LONG TERM DISABILITY INCOME POLICY

PREMIUMS  (Continued)

**CALCULATION OF PREMIUMS.**  The premium will be calculated by multiplying the total amount of Covered Payroll on the Premium Due Date by the Monthly Premium Rate applicable on that date.  If the Policyholder and the Insurance Company agree to a change in the method of premium payment or to a change in the Anniversary Date, an appropriate pro rata adjustment will be made in the premium due.

**CHANGES IN PREMIUM RATES.**  The premium rates may be changed by the Insurance Company from time to time with at least 31 days advance written notice.  No change in rates will be made until 24 months after the Effective Date.  An increase in rates will not be made more often than once in a 12 month period.  However, the Insurance Company reserves the right to change the rates at any time if: 1) the terms of the policy change; 2) a division, subsidiary, affiliated company or eligible class is added or deleted from the policy; 3) there is a change in the factors bearing on the risk assumed; or 4) any federal or state law or regulation is amended to the extent that the Company's benefit obligation is affected.  If an increase in rates takes place on a date that is not a Premium Due Date, a pro rata premium will be due on the date of the increase.  The pro rata premium will apply for the increase from the date of the increase to the next Premium Due Date.  If a decrease in rates takes place on a date that is not a Premium Due Date credit will be granted.  The pro rata credit will apply for the decrease from the date of the decrease to the next Premium Due Date.

EXHIBIT A

000040

ᴸONG TERM DISABILITY INCOME POLIᴼ

## CANCELLATION OF POLICY

NOTICE OF CANCELLATION.

The Policyholder or the Insurance Company may cancel the policy as of any Premium Due Date by giving written notice at least 31 days in advance of that date.

If a premium is not paid when due, the policy will automatically be cancelled as of the Premium Due Date, except as set forth below.

The Insurance Company may cancel the policy as of any premium due date if the number of insured Employees is less than 10 or less than 75% of those eligible.

GRACE PERIOD.

If, before a Premium Due Date, the Policyholder has not given written notice to the Insurance Company that the policy is to be cancelled, a Grace Period of 31 days will be granted for the payment of each premium after the initial premium. The policy will stay in effect during that time. If any premium is not paid by the end of the Grace Period, the policy will automatically be cancelled at the end of the Grace Period; except that, if the Policyholder has given written notice in advance of an earlier date of cancellation, the policy will be cancelled as of the earlier date. The Policyholder will be liable to the Insurance Company for any unpaid premium for the time the policy was in force.



000041

LONG TERM DISABILITY INCOME POLICY

### PAYMENT OF BENEFITS

**TO WHOM PAYABLE.** Any benefits that are payable for Disability will be paid to the Employee. Family Benefits will be paid to the eligible survivor(s) according to the terms of that section.

If any person to whom benefits are payable is a minor or, in the opinion of the Insurance Company, is not able to give a valid receipt for any payment due him, such payment will be made to his legal guardian. However, if no request for payment has been made by his legal guardian, the Insurance Company, may at its option, make payment to the person or institution appearing to have assumed his custody and support.

If an Employee dies while any of his Disability benefits remain unpaid, the Insurance Company may, at its option, make direct payment to any of the following living relatives of the Employee: spouse, mother, father, children, brothers or sisters; or to the executors or administrators of the Employee's estate.

Payment in the manner described above will release the Insurance Company from all liability to the extent of any payment made.

**TIME OF PAYMENT.** Any Disability benefits will be paid at regular intervals of not more than one month. Any balance which remains unpaid at the end of any period for which the Insurance Company is liable will be paid at that time.



EXHIBIT A

000042

LONG TERM DISABILITY INCOME POLICY

## PROVISIONS

**ENTIRE CONTRACT.** The entire contract will be made up of the policy, the application of the Policyholder, a copy of which is attached to the policy, and the applications, if any, of the Employees.

**POLICY CHANGES.** Changes may be made in the policy only by amendment signed by the Policyholder and by the Insurance Company acting through its President, Vice President, Assistant Vice President, Director or Assistant Director. No agent may change or waive any terms of the policy.

**STATEMENTS NOT WARRANTIES.** All statements made by the Policyholder or by an insured Employee will be deemed representations and not warranties. No statement made by the Policyholder or by the Employee to obtain insurance will be used to void or reduce the insurance unless it is made in writing and is signed by the Policyholder or the Employee and a copy is sent to the Policyholder, the Employee or his Beneficiary.

**NOTICE OF CLAIM.** Written notice of claim must be given to the Insurance Company within 30 days after the occurrence or start of the loss on which a claim is based. If notice is not given in that time, the claim will not be invalidated or reduced if it is shown that written notice was given as soon as was reasonably possible.

**CLAIM FORMS.** When the Insurance Company receives the notice of claim, it will give to the claimant, or to the Policyholder for the claimant, the claim forms it uses for filing proof of loss. If the claimant does not get these claim forms within 15 days after the Insurance Company receives notice of claim, he will be considered to have met the proof of loss requirements if he submits written proof of loss within 90 days after the date of loss. This proof must describe the occurrence, character and extent of the loss for which a claim is made.

**PROOF OF LOSS.** Written proof of loss must be given to the Insurance Company within 90 days after the date of the loss for which a claim is made. If written proof of loss is not given in that time, the claim will not be invalidated nor reduced if it is shown that written proof of loss was given as soon as was reasonably possible. Upon request, written proof of continued Disability and of regular attendance of a physician must be given to the Insurance Company within 30 days of such request.

**PHYSICAL EXAMINATION.** The Insurance Company, at its own expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require.

**LEGAL ACTIONS.** No action at law or in equity will be brought to recover on the policy until at least 60 days after proof of loss has been filed with the Insurance Company. No action will be brought at all unless brought within 3 years (Kansas: 5 years; South Carolina: 6 years), after the time within which proof of loss is required by the policy.

**TIME LIMITATIONS.** If any time limit set forth in the policy for giving notice of claim or proof of loss, or for bringing any action at law or in equity is less than that permitted by the law of the state in which the Employee lives when the policy is issued, then the time limit provided in the policy is extended to agree with the minimum permitted by the law of that state.

LM-6N32



EXHIBIT A

000043

LONG TERM DISABILITY INCOME POLICY

PROVISIONS (Continued)

**PHYSICIAN/PATIENT RELATIONSHIP.** The Employee will have the right to choose any physician who is practicing legally. The Insurance Company will in no way disturb the physician/patient relationship.

**CERTIFICATES.** The Insurance Company will issue to the Policyholder for delivery to each insured Employee an individual certificate. The Policyholder will be responsible for distributing the certificates to its Employees. The certificate will show the benefits provided under the policy. It will set forth any changes in benefits due to age and to whom benefits will be paid. Nothing in the certificate will change or void the terms of the policy.

LM-6N32                          Provisions

Page 27



000044

LONG TERM DISABILITY INCOME POLICY

---

## MISCELLANEOUS PROVISIONS

**INSURANCE DATA.** The Policyholder will give the Insurance Company all of the data that it needs to calculate the premium and all other data that it may reasonably require. Failure of the Policyholder to give this data will not void or continue an Employee's insurance. The Insurance Company has the right to examine the Policyholder's records relative to these benefits at any reasonable time while the policy is in effect. It also has this right until all rights and obligations under the policy are finally determined.

**MALE PRONOUN.** The male pronoun as used herein will be deemed to include the female.

**INCORRECT PREMIUM PAYMENT.** Premiums paid in error for a person who is not eligible to be insured, or for a person after his insurance has ceased, will be refunded without interest when requested by the Policyholder. This premium will not be refunded, however, for more than a 6 month period nor for any period before the last Anniversary Date.

**ADMINISTRATION.** The Insurance Company will deal solely with the Policyholder who will be deemed the representative of each Employee. Any action taken by the Policyholder will be binding on the Employees.

**NOT IN LIEU OF WORKERS' COMPENSATION.** The policy is not in lieu of and does not affect requirements for coverage under workers' compensation laws.

---



LIFE INSURANCE COMPANY OF NORTH AMERICA

### AMENDATORY RIDER

This rider amends the policy to which it is attached.  It replaces any previous rider as of the effective date stated below.

### AFFILIATED OR SUBSIDIARY EMPLOYERS

Classes of employees of the employers named below are eligible to be covered by this policy.

Granite Broadcasting (Week-TV 25)

Granite Broadcasting (KNTV)

Granite Broadcasting (KBJR-TV 6)

Granite Broadcasting (WPTA-TV)

Granite Broadcasting (WTVH-5)

Granite Broadcasting (KSEE-TV 24)

No other policy provision or condition is changed in any way by this rider.

| Effective date | | Part of Policy No. |
|---|---|---|
| January 1, 1995 | at the hour stated in the policy | FLK-8059 |
| Issued To:<br>GRANITE BROADCASTING CORPORATION | | |

LM-6N34

JOHN K. LEONARD, President

SPECIMEN

Page 29



000046

LIFE INSURANCE COMPANY OF NOR .. AMERICA
Philadelphia, Pennsylvania

We, GRANITE BROADCASTING CORPORATION

whose main office address is East Peoria, IL

hereby apply to the Life Insurance Company of North America for Group Policy

No. FLK-8059

We approve and accept the terms of this Group Policy.

This application is to be signed in duplicate. One part is to be attached to the Group
Policy; the other part is to be returned to the Life Insurance Company of North America.

This application supersedes any previous application for this Group Policy.

GRANITE BROADCASTING CORPORATION
(Full or Corporate Name of Applicant)

Signed at_____ By_____
                                                    (Signature and Title)

On_____ Witness_____
              (To be signed by Licensed Resident Agent where required by law)

LM-1K59        (This Copy is To Remain Attached To The Policy)

---

LIFE INSURANCE COMPANY OF NORTH AMERICA
Philadelphia, Pennsylvania

We, GRANITE BROADCASTING CORPORATION

whose main office address is East Peoria, IL

hereby apply to the Life Insurance Company of North America for Group Policy

No. FLK-8059

We approve and accept the terms of this Group Policy.

This application is to be signed in duplicate. One part is to be attached to the Group
Policy; the other part is to be returned to the Life Insurance Company of North America.

This application supersedes any previous application for this Group Policy.

GRANITE BROADCASTING CORPORATION
(Full or Corporate Name of Applicant)

Signed at_____ By_____
                                                    (Signature and Title)

On_____ Witness_____
              (To be signed by Licensed Resident Agent where required by law)

LM-1K59        (This Copy is To Be Returned To Us)

Page 30

EXHIBIT A

000047